## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| GARRETH PARKS, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BALTIMORE POLICE DEPARTMENT, | ) | |
| DETECTIVE BLANE VUCCI, DETECTIVE | ) | |
| GORDON CAREW, OFFICER JOSEPH | ) | |
| MUELLER, OFFICER KIMBERLY PARKS, | ) | Case No. _____ |
| OFFICER TODD TUGYA, SERGEANT PAUL | ) | |
| DEAN, BARRY GRANT, DETECTIVE | ) | **JURY DEMANDED** |
| JOSEPH JEFFERSON, LIEUTENANT | ) | |
| HORTON, OFFICER TOM PFEILER, | ) | |
| OFFICER BRIAN FORD, DETECTIVE | ) | |
| KEVIN BUIE, DETECTIVE JOHN RIDDICK, | ) | |
| DETECTIVE J. PHELPS, DETECTIVE RAY | ) | |
| LASLETT, OFFICER DONALD WATSON, | ) | |
| OFFICER VICTOR HAGEE, AND | ) | |
| UNKNOWN EMPLOYEES OF THE | ) | |
| BALTIMORE CITY POLICE DEPARTMENT, | ) | |
| | ) | |
| Defendants | ) | |

## COMPLAINT

Plaintiff Garreth Parks, by counsel, Brown Law and Loevy & Loevy, sues defendants Baltimore Police Department, Detective Blane Vucci, Detective Gordon Carew, Officer Joseph Mueller, Officer Kimberly Parks, Officer Todd Tugya, Sergeant Paul Dean, Barry Grant, Detective Joseph Jefferson, Lieutenant Horton, Officer Tom Pfeiler, Officer Brian Ford, Detective Kevin Buie, Detective John Riddick, Detective J. Phelps, Detective Ray Laslett, Officer Donald Watson, Officer Victor Hagee, and unknown employees of the Baltimore City Police Department, and states the following:

**Introduction**

1.      Garreth Parks is an innocent man who spent more than 16 years in prison for crimes he did not commit.

2.      Defendants, the Baltimore Police Department ("BPD") and individual BPD employees ("Individual Defendants") obtained a conviction against Mr. Parks by withholding evidence and fabricating evidence.

3.      Most egregiously, Defendants withheld evidence and fabricated evidence so that Mr. Parks would be charged and convicted of the murder of Charles Hill, even though Defendants knew that someone else had shot and killed Hill and had immediately confessed to doing so. An official police report, written shortly after Defendants arrived on the scene of the shooting, documented the shooter's confession—but Defendants buried that report.

4.      Defendants also fabricated a false counter-narrative that Mr. Parks was the shooter, and Defendants coerced and exploited vulnerable citizens to give false statements that backed up Defendants' false version of events.

5.      For more than 16 years, Mr. Parks steadfastly maintained his innocence and fought to regain his freedom, which he finally did after the report documenting the real shooter's confession came to light.

6.      While significant harm is done to anyone who is wrongfully convicted of a crime, the harm done to Mr. Parks is particularly severe. He was just 16 years old at the time of his arrest, but was tried and convicted as an adult and sent to some of the worst prisons in the country, where he was constantly surrounded by violence and the threat of violence. Mr. Parks lost numerous family members while he was locked up,

including aunts, uncles, and cousins. Most painfully, he lost his grandmother—his best friend in the world—and he was not even allowed to attend her funeral.

7.      This lawsuit seeks redress for Mr. Parks's injuries and the defendants' misconduct.

## Jurisdiction and Venue

8.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Parks's rights as secured by the United States Constitution.

9.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to this complaint occurred in this judicial district.

## The Parties

10.      Mr. Parks is a 35-year-old resident of Baltimore, Maryland. He was born and raised in Baltimore. His wife, mother, uncle, and other close relatives, are Baltimore natives and residents.

11.      At all relevant times, Blane Vucci, Gordon Carew, Joseph Mueller, Kimberly Parks, Todd Tugya, Paul Dean, Barry Grant, Joseph Jefferson, Lieutenant Horton, Tom Pfeiler, Brian Ford, Kevin Buie, John Riddick, J. Phelps, Ray Laslett, Donald Watson, Victor Hagee, and other unknown police personnel (hereinafter "Individual Defendants") were police employees of the Baltimore Police Department. Mr. Parks sues these defendants in their individual capacities, acting under color of law and within the scope of their employment during the investigation of the death of Charles Hill and related events and circumstances.

12.     Defendant Baltimore Police Department (hereinafter "the BPD" or "BPD") is or was the employer of each of the Individual Defendants. The BPD is a person within the meaning of 42 U.S.C. § 1983.

## Mr. Parks's Actions

13.     On or about July 16, 1999, a man named Anthony Burgess took a gun away from a teenager named Joseph Smith, upsetting the teen.

14.     Mr. Parks knew both Smith and Burgess.

15.     Mr. Parks went, unarmed, to Burgess's house, thinking he could help resolve the situation peacefully.

16.     But Burgess and a group of his friends and family members, including his nephew Charles Hill, aggressively confronted Mr. Parks, robbed him, assaulted him, pointed a loaded gun at him, and made him fear for his life.

17.     During the scuffle that ensued, Mr. Parks never had control of a gun, never pointed a gun at anyone, and never fired a gun.

18.     Nonetheless, Mr. Parks heard several shots fired.

19.     Mr. Parks was able to free himself and run for safety. Mere minutes later and mere blocks away, he was stopped by Defendants, and he reported that he had just been robbed. Defendants searched him and found no weapon.

20.     Unbeknownst to Mr. Parks, both Burgess and Hill, at some point, had been hit by gunfire. Mr. Parks did not and does not know how or when they were hit. But instead of being treated as the victim of a robbery, Mr. Parks was treated as the suspect in a serious crime.

21.    Individual Defendants arrested Mr. Parks and put him in a caged police car to be taken to the police station, although Individual Defendants falsely told Mr. Parks that he was not under arrest.

**Burgess Confesses but Defendants Bury the Confession**

22.    Numerous Baltimore Police personnel responded to the general vicinity of the crime, including at least the following Defendants:

        a.  Mueller

        b.  Parks

        c.  Hagee

        d.  Watson

        e.  Dean

        f.  Vucci

        g.  Horton

        h.  Pfeiler

        i.  Ford

        j.  Tugya

23.    Defendant Dean was the sergeant, and Defendant Watson, having arrived on scene first, was given the duties of the primary responding officer.

24.    Burgess was in that general vicinity and he confessed to Defendants that *he* shot Mr. Hill.

25.    At least one of the officers, Defendant Mueller, recorded Burgess's confession in an official police report ("Mueller Report").

26.    The Mueller Report explicitly states that "Anthony Burgess admits that he shot Mr. Hill."

27.     Sadly, Mr. Hill died.

28.     Rather than properly investigate the shooting and pursue Burgess's confession, the Individual Defendants, collectively and as individuals, made a deliberate plan, and conspired, to suppress Burgess's confession and pursue Mr. Parks.

29.     Mr. Parks was charged with Hill's murder; assault and attempted murder of Burgess; and handgun violations.

30.     By about 6:30 p.m.—barely more than 12 hours after the shooting, Individual Defendants had marked the case "closed" due to Mr. Parks's arrest.

**Police Suppress Burgess's Statement and Other Evidence**

31.     Individual Defendants, collectively and as individuals, buried Burgess's confession.

32.     Though several Individual Defendants were on the scene when and where Burgess confessed, only Defendant Mueller reported the confession; or otherwise the reports from other Defendants were buried and/or destroyed in bad faith.

33.     Additionally, Individual Defendants, collectively and as individuals, buried the Mueller Report.

34.     Individual Defendants, collectively and as individuals, excluded the Mueller Report from the official homicide file.

35.     Individual Defendants, collectively and as individuals, withheld the Mueller Report from the prosecutor.

36.     Individual Defendants, collectively and as individuals, withheld the Mueller Report from Mr. Parks.

37.     For example and without limitation, Defendants Vucci, Carew, and Jefferson were the detectives in charge of the investigation and responsible for

assembling and approving the official homicide file and for presenting the facts of the case to the prosecutor, and Defendant Grant was their supervisor and signed off on their activities and handling of documents in the case.

38.     Notwithstanding those obligations, the Mueller Report was never placed in the homicide file nor was it otherwise disclosed.

39.     The Mueller Report is not the only evidence that the Individual Defendants buried. For example, Individual Defendants also buried the gun or guns used to shoot Burgess and Hill, and destroyed them in bad faith. Had they not been buried and destroyed, the gun or guns—through ballistics testing, firearms tracing, inconsistency with the Individual Defendants' false narrative, and/or other means—would also have exculpated Mr. Parks. The Individual Defendants also buried the fact that much—if not all—of the evidence they "gathered" against Mr. Parks was entirely false and fabricated, as discussed next.

**Police Fabricate Evidence Against Mr. Parks**

40.     Having decided to pursue Mr. Parks, Individual Defendants fabricated false witness statements by coercing and exploiting vulnerable witnesses, including Smith, Burgess, and Burgess's friends and family members. Defendants never disclosed the fact that the evidence was obtained through coercion, nor did they disclose the manner in which it was coercively obtained.

41.     For example and without limitation, Individual Defendants who participated in coercively obtaining false evidence, including witness statements, photo-array identifications, and show-up identifications from these witnesses include at least Defendants Vucci, Carew, Jefferson, Grant, Mueller, Watson, Buie, Riddick, Horton, Pfeiler, Ford, Phelps, and Laslett.

42.     For example, Individual Defendants interrogated Smith, who was just 16 years old, and threatened to lock him up for the rest of his life if he did not give an account of events that was consistent with Individual Defendants' false narrative. Smith was coerced into giving a false statement that implicated Mr. Parks. The coercion that was used to procure this false statement was never disclosed.

43.     These false witness statements and identifications were used against Mr. Parks to pursue and obtain his convictions.

**Mr. Parks's Trial**

44.     From the moment he was arrested, Mr. Parks maintained his innocence. He proceeded to trial and took the witness stand in his own defense.

45.     The evidence against Mr. Parks was false, including the fabricated false narrative that the Individual Defendants had concocted by coercing and exploiting vulnerable witnesses.

46.     Moreover, Burgess took the stand and claimed that Mr. Parks was the shooter, contradicting the confession he gave on the scene right after the incident occurred.

47.     Of course, Mr. Parks was completely in the dark about the fact that Burgess had confessed, and about the fact that at least one Individual Defendant had recorded that confession in an official police report. Because that confession was never disclosed, neither the report, nor the officer's testimony, could be used to impeach Burgess's lie.

48.     And because the Individual Defendants buried and/or destroyed in bad faith the gun or guns used to shoot Burgess and Hill, Mr. Parks could present no exonerating evidence related to the weapons.

49.     The jury convicted Mr. Parks. Rather than pretend he was guilty in order to seek a lenient sentence, Mr. Parks steadfastly maintained his innocence. The judge sentenced him to 80 years in prison.

### Mr. Parks Refuses to Give Up

50.     After his conviction, Mr. Parks continued to fight to prove his innocence.

51.     Mr. Parks filed a direct appeal of his conviction, but his appeal was denied.

52.     Mr. Parks pursued a post-conviction petition and used the Maryland Public Information Act (MPIA) to request the full police file for his case. The BPD responded to the MPIA request, but it did not turn over the Mueller Report.

53.     Mr. Parks also obtained the prosecutor's file, and the Mueller Report was not in it.

54.     Mr. Parks's post-conviction counsel also made an MPIA request for the prosecutor's file. The file was produced but, like the file the BPD produced, it did not include the Mueller Report.

55.     Mr. Parks's post-conviction petition was denied.

56.     Even after his post-conviction petition was denied, Mr. Parks insisted on his innocence and tried to prove it. He wrote a letter to the Clerk of the Baltimore City Circuit Court, requesting a copy of his court file. A clerk sent him several documents. One of the documents was the Mueller Report.

### Petition for Writ of Actual Innocence

57.     Mr. Parks, through counsel, filed a Petition for Writ of Actual Innocence. The petition was based on the discovery of the Mueller Report.

58.     During the Writ of Actual Innocence proceedings, Defendant Mueller verified his handwriting and signature on the Mueller Report.

59.     A handwriting expert also verified that the Mueller Report is written in Defendant Mueller's handwriting.

60.     Defendant Mueller confirmed that what he wrote in the Mueller Report is what Burgess told him on the night of the crime.

61.     At the hearing on the Petition for Writ of Actual Innocence, the prosecutor said that the State had "conducted an extremely thorough investigation in this case, including interviewing witnesses, most importantly" Defendant Mueller, who "authenticated his handwriting and his signature" on the report documenting Burgess's confession. The prosecutor further said that if Burgess's trial testimony had "been impeached with the police report or by the testimony of a police officer in this case, I think it would have created a significant or substantial possibility of a different result," and for that reason, the State of Maryland consented to Mr. Parks's Petition for Writ of Actual Innocence and his convictions were vacated on March 3, 2015.

62.     On or about June 5, 2015, Parks filed a notice of claim with the State of Maryland, the Mayor and City of Baltimore, the Office of the State's Attorney of Baltimore City, Baltimore City and the Baltimore City Police Department.

63.     Even after his convictions were vacated, the State re-charged him and tried to get him to plead guilty to crimes he did not commit. Mr. Parks refused to plead guilty and the State eventually dropped all charges on October 9, 2015.

**Baltimore's Policy and Practice of Conducting Flawed Investigations**

64.     The constitutional violations that caused Mr. Parks's wrongful convictions were not isolated events. To the contrary, they were the result of the

Baltimore Police Department's policies and practices of pursuing wrongful convictions through reliance on profoundly flawed investigations.

65.     By the time of Hill's death and the investigation that led to Mr. Parks's wrongful arrest and prosecution, those policies were firmly entrenched. In a race to clear murder cases, the BPD cut corners and rushed to judgment. Sometimes those constitutional errors were exposed prior to prosecution. For example, in 1988, nearly 10 percent of Baltimore's 234 homicides were cleared by the BPD through arrest, but later dropped by the State's Attorney's Office prior to indictment.

66.     Other times, however, the BPD's unconstitutional conduct was not exposed until long after a prosecution and conviction had been completed.

67.     In Mr. Parks's case, the unconstitutional fabrication of false inculpatory evidence and/or withholding of exculpatory information and/or bad-faith destruction of exculpatory or potentially exculpatory information was undertaken pursuant to, and caused by a policy and practice on the part of the BPD.

68.     The unlawful misconduct described in this Complaint occurred systematically, pursuant to policies and practices, and accordingly occurred in other cases as well.

69.     For example, Sabein Burgess was convicted of the 1994 murder of his girlfriend. But the BPD had highly exculpatory evidence that was never turned over—in particular, exculpatory information that the FBI had provided, and a statement from the victim's son who had seen the killers and told officers that Mr. Burgess was not one of them. That evidence eventually came to light, leading to Burgess's exoneration in 2014. In 2017, a jury awarded him $15 million in his lawsuit against the BPD and one of its

detectives. During that civil suit, BPD detectives testified to the effect that BPD policies and practices did not require detectives to document investigative steps, record all evidence in official reports, or turn all documents over to prosecutors.

70.     Similarly, James Owens's 1988 conviction was overturned after Owens discovered that the police withheld evidence of highly inconsistent statements by the prosecution's star witness. On or about May 2, 2018, Owens's lawsuit against the BPD and several of its detectives was settled for $9 million.

71.     Likewise, Jerome Johnson was convicted of the 1988 murder of Aaron Taylor. In 2018, he was finally exonerated after it was learned that the key witness against him had given a dramatically different account of events on the very day of the crime, and a BPD officer had recorded that statement in an official report, but that report had been buried.

72.     Similarly, Wendell Griffin was convicted of the 1981 murder of James Wise. In 2011, Griffin discovered numerous documents in the BPD file that were never turned over to him, including exculpatory reports that showed that the two key witnesses in the case had failed early in the investigation to identify Griffin as the perpetrator.

73.     In addition, in 1995 Antoine Pettiford was convicted of the murder of Oscar Lewis. After his conviction, Pettiford discovered witness statements and other highly exculpatory material that the BPD never disclosed. Following that discovery, Pettiford's plea was vacated and all charges against him were dismissed.

74.     Indeed, the Homicide Unit was in such a state of disarray that in January 2000, then-Commissioner Daniel asked BPD officer Stephen Tabeling to prepare a report on the state of the Unit ("Tabeling Report"). In that report, Tabeling found that

investigatory files were in a general state of disarray; that there was no procedure for ensuring that all material about an investigation had been recorded and filed appropriately; and that the Unit's practices with the assembly, storage, retrieval, confidentiality and security of case folders was highly deficient.

75.     Consistent with the municipal policies and practices described in the cases referenced in the preceding paragraphs as well as others, Individual Defendants in this case fabricated police reports that they knew to be false and concealed exculpatory evidence, including the weapons and a confession from Burgess, and the fact that the inculpatory statements and identifications were fabricated. None of this evidence was ever disclosed to the prosecution or to Mr. Parks's criminal-defense team.

76.     The practice described in the preceding paragraphs was consciously approved by policymakers who were deliberately indifferent to the violations of constitutional rights described herein, and the practice was a cause of the injuries suffered here by Mr. Parks.

77.     The BPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. It thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Mr. Parks's ongoing injuries.

**Failure to Train, Supervise, and Discipline**

78.     The constitutional violations described above were also caused by the BPD's failure to train, supervise, and discipline its police employees.

79.     The BPD's failure to train, supervise, and discipline its employees effectively condones, ratifies, and sanctions the kind of misconduct that the Individual Defendants committed against Mr. Parks in this case. Constitutional violations such as

occurred in this case are encouraged and facilitated as a result of the BPD's practices and *de facto* policies, as alleged above.

80.     Indeed, the Tabeling Report found numerous deficiencies in training, including in many basic legal and investigative concepts. .

81.     For example, there was a failure during the relevant time period to train police employees on disclosing evidence and complying with their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and that case's progeny and extensions, notwithstanding the obvious necessity of such training.

82.     In addition, the BPD failed to properly supervise and discipline its police employees. As a result, employees continue to violate citizens' rights in the manner described more fully above, with impunity.

83.     The failure to train, supervise and discipline BPD employees was consciously approved at the highest policy-making level by policymakers who were deliberately indifferent to the violations of constitutional rights described herein, and was a cause of the injuries suffered here by Mr. Parks.

84.     The BPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (outside of the judicial process) to remedy Mr. Parks's ongoing injuries.

### Mr. Parks's Damages

85.     Mr. Parks spent more than 16 years in prison for a murder and other crimes he did not commit.

86.     Mr. Parks must now attempt to make a life for himself outside of prison without the benefit of 16 years of life experiences, which normally equip adults for that task.

87.     Additionally, the emotional pain and suffering caused by losing more than 16 years in the prime of his life has been substantial.

88.     Mr. Parks was just 16 years old at the time of his arrest, but was tried and convicted as an adult and sent to some of the worst prisons in the country, where he was constantly surrounded by violence and the threat of violence.

89.     During his wrongful incarceration, Mr. Parks was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals, and other life events with loved ones, the opportunity to pursue a career, and the fundamental freedom to live one's life as an autonomous human being.

90.     Mr. Parks's 16 years of wrongful incarceration forced him into a world of isolation in which he lost contact with his friends and family in the outside world. Instead of living as a free man, he was subject to harsh conditions and even abuse.

91.     As a result of the foregoing, Mr. Parks has suffered tremendous damage, including physical sickness and injury and emotional damage, all proximately caused by Defendants' misconduct.

## Count I – 42 U.S.C. § 1983
## Due Process (All Defendants)

92.     Each paragraph of this Complaint is incorporated as if restated fully herein.

93.     As described more fully above, Individual Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Parks of his constitutional right to due process.

94.     In the manner described more fully above, Individual Defendants, individually, jointly, and/or in concert and in conspiracy, fabricated false evidence and/or deliberately withheld exculpatory evidence and/or destroyed exculpatory or potentially exculpatory evidence in bad faith. In doing so, the Individual Defendants violated Mr. Parks's clearly established constitutional right to due process.

95.     Absent Defendants' misconduct, the prosecution of Mr. Parks could not and would not have been pursued, and/or Mr. Parks would not have been convicted, and/or Mr. Parks would have been exonerated and released sooner than he was.

96.     The Individual Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Mr. Parks and his continuing wrongful imprisonment, denied him his constitutional right to a fair trial, and offended recognized fundamental principles of justice and fairness, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

97.     As a direct and proximate result of this violation of his constitutional right to a fair trial, Mr. Parks suffered injuries, including but not limited to the loss of liberty, physical sickness and injury, and emotional distress.

98.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, in bad faith, and with willful indifference to Mr. Parks's clearly established constitutional rights.

99.     The misconduct described in this Count by the Individual Defendants was undertaken pursuant to the policy and practice of the BPD, in the manner more fully described above and in Count VI below.

## Count II – 42 U.S.C. § 1983
## Federal Malicious Prosecution (All Defendants)

100.    Each paragraph of this Complaint is incorporated as if restated fully herein.

101.    As described more fully above, Individual Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, caused the seizure of Mr. Parks by legal process.

102.    In particular, the Individual Defendants caused a criminal proceeding to be commenced and/or continued against Mr. Parks that resulted in the Mr. Parks being deprived of his liberty, despite there being no probable cause for commencing and/or continuing that criminal proceeding, in violation of the Fourth Amendment to the United States Constitution.

103.    The proceedings against Mr. Parks terminated in his favor.

104.    As a direct and proximate result of the Individual Defendants' misconduct described in this Count, Mr. Parks suffered injuries, including but not limited to loss of liberty, physical injury and sickness, and emotional distress.

105.    The misconduct described in the Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Mr. Parks's clearly established constitutional rights.

106.     The misconduct described in this Count by the Individual Defendants was undertaken pursuant to the policy and practice of the BPD, in the manner more fully described above and in Count VI below.

### Count III – 42 U.S.C. § 1983
### Detention without Probable Cause (All Defendants)

107.     Each paragraph of this Complaint is incorporated as if restated fully herein.

108.     In the manner described above, Individual Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, detained Mr. Parks.

109.     There was no probable cause for Mr. Parks's detention.

110.     As a result of the Defendants' action, Mr. Parks's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical injury and sickness, and emotional distress.

111.     The misconduct described in the Count was objectively unreasonable and was undertaken intentionally, in bad faith and with willful indifference to Mr. Parks's rights.

112.     The misconduct described in this Count by the Individual Defendants was undertaken pursuant to the policy and practice of the BPD, in the manner more fully described above and in Count VI below.

### Count IV – 42 U.S.C. § 1983
### Failure to Intervene (All Defendants)

113.     Each paragraph of this Complaint is incorporated as if restated fully herein.

114.     In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, Individual Defendants stood by without intervening to prevent the violation of Mr. Parks's constitutional rights, even though they had the opportunity to do so.

115.     As a direct and proximate result of the Individual Defendants' failure to intervene to prevent the violation of Mr. Parks's constitutional rights, Mr. Parks suffered injuries, including but not limited to loss of liberty, physical injury and sickness, and emotional distress. Individual Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

116.     The misconduct described in the Count was objectively unreasonable and was undertaken intentionally, in bad faith and with willful indifference to Mr. Parks's clearly established constitutional rights.

117.     The misconduct described in this Count by the Individual Defendants was undertaken pursuant to the policy and practice of the BPD, in the manner more fully described above and in Count VI below.

### Count V – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights (All Defendants)

118.     Each paragraph of this Complaint is incorporated as if restated fully herein.

119.     In the manner described above, Individual Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals (known and unknown, within and without the BPD) to act in concert in order to deprive Mr. Parks of his constitutional rights, including his rights to due process

and to be free from unreasonable detention without probable cause, all as described in the various paragraphs of this complaint.

120.     Additionally, before and after Mr. Parks's conviction, the Individual Defendants further conspired to deprive Mr. Parks of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration.

121.     In this manner, Individual Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

122.     In furtherance of the conspiracy, one or more of the co-conspirators engaged in and facilitated one or more overt acts, including but not limited to those set forth above—such as fabricating evidence and/or withholding exculpatory evidence and/or destroying exculpatory or potentially exculpatory evidence in bad faith—and was an otherwise willful participant in joint activity.

123.     As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Mr. Parks's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical injury and sickness, and emotional distress.

124.     The misconduct described in the Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Mr. Parks's rights.

125.     The misconduct described in this Count by the Individual Defendants was undertaken pursuant to the policy and practice of the BPD, in the manner more fully described above and in Count VI below.

### Count VI – 42 U.S.C. § 1983
### *Monell* Policy Claims (BPD)

126.     Each paragraph of this Complaint is incorporated as if restated fully herein.

127.     The actions of all the Individual Defendants and other known and unknown co-conspirators were undertaken pursuant to policies and practices of the BPD, described above, which were ratified by policymakers with final policymaking authority. These policies and practices included the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above. The policies and practices also included the failure to turn over exculpatory evidence (both before and after a criminal trial) and to rely on fabricated evidence, including fabricated witness statements, identifications, and police reports.

128.     The policies and practices described in this Count were maintained and implemented by the BPD with deliberate indifference to Mr. Parks's constitutional rights.

129.     As a direct and proximate result of the BPD's actions, Mr. Parks's constitutional rights were violated and he suffered injuries including but not limited to loss of liberty, physical injury and sickness, and emotional distress.

### Count VII – State Law Claim
### Malicious Prosecution (Individual Defendants)

130.     Each paragraph of this Complaint is incorporated as if restated fully herein.

131.     Individual Defendants accused Mr. Parks of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors and other officials with the intent of exerting influence and to institute and continue the judicial proceedings.

132.     Individual Defendants caused Mr. Parks to be improperly subjected to judicial proceedings for which there was no probable cause, resulting in injury.

133.     Individual Defendants' statements regarding Mr. Parks's alleged culpability were made with knowledge that said statements were false and perjured. Individual Defendants fabricated evidence and/or withheld exculpatory evidence and/or destroyed exculpatory or potentially exculpatory evidence in bad faith. Individual Defendants were aware that, as described more fully above, no true or reliable evidence implicated Mr. Parks in the murder of Charles Hill, assault of Anthony Burgess, or associated crimes.

134.     Individual Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Mr. Parks, as set forth above, and failed to investigate evidence which would have implicated the actual perpetrator.

135.     The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

136.     The prosecution was eventually terminated in Mr. Parks's favor.

137.     As a direct and proximate result of this misconduct, Mr. Parks sustained, and continues to sustain, injuries as set forth above, including physical sickness and injury, and emotional distress.

**Count VIII – State Law Claim**
**Abuse of Process**

138.     Each paragraph of this Complaint is incorporated as if restated fully herein.

139.     As explained more fully above, Individual Defendants willfully misused the criminal process against Mr. Parks for a purpose different than the proceeding's intended purpose.

140.     Indeed, rather than investigate and prosecute the real perpetrator, Individual Defendants fabricated evidence and/or withheld exculpatory evidence and/or destroyed exculpatory or potentially exculpatory evidence in bad faith, to frame Mr. Parks for crimes that he did not commit.

141.     The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

142.     As a direct and proximate result of this misconduct, Mr. Parks sustained, and continues to sustain, injuries as set forth above, including physical sickness and injury, and emotional distress.

**Count IX – State Law Claim**
**Intentional Infliction of Emotional Distress**

143.     The acts and conduct of Individual Defendants as set forth above were extreme and outrageous. Individual Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mr. Parks, as is more fully alleged above.

144.     As a direct and proximate result of Individual Defendants' actions, Mr. Parks suffered and continues to suffer physical sickness and injury, and severe emotional distress.

### Count X – State Law Claim
### Civil Conspiracy

145.     Each paragraph of this Complaint is incorporated as if restated fully herein.

146.     As described more fully in the preceding paragraphs, Individual Defendants, acting in concert with each other and with other individuals (known and unknown, within and without the BPD) conspired by concerted action to accomplish an unlawful purpose by unlawful means.

147.     In furtherance of the conspiracy, one or more of the co-conspirators engaged in and facilitated one or more overt acts and were otherwise willful participants in joint activity including but not limited to abuse of process, the malicious prosecution of Mr. Parks, and the intentional infliction of emotional distress upon Mr. Parks.

148.     The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

149.     As a direct and proximate result of Individual Defendants' conspiracy, Mr. Parks suffered damages, including physical sickness and injury, and severe emotional distress, as is more fully alleged above.

### Count XI – State Law Claim
### Directly Under the Maryland Constitution

150.     Each paragraph of this Complaint is incorporated as if restated fully herein.

151.     As described more fully in the preceding paragraphs, Individual

Defendants violated Mr. Parks's due process rights, in violation of the Maryland

Declaration of Rights, including but not limited to Articles 19, 24, and 26.

152.     As a direct and proximate result of Individual Defendants' actions, Mr.

Parks was wrongfully imprisoned for more than 16 years for a crime that he did not

commit.

153.     As a direct and proximate result of Individual Defendants' actions, Mr.

Parks suffered damages, including physical sickness and injury, and severe emotional

distress, as is more fully alleged above.

### Count XII – State Law Claim
### Indemnification

154.     Each paragraph of this Complaint is incorporated as if restated fully

herein.

155.     Maryland law provides that public entities are directed to pay any tort

judgment for compensatory damages for which employees are liable within the scope of

their employment activities.

156.     The Individual Defendants are or were employees of the Baltimore

Police Department, who acted within the scope of their employment in committing the

misconduct described herein.


WHEREFORE, Mr. Parks, GARRETH PARKS, respectfully requests that this

Court enter judgment in his favor and against Defendants BALTIMORE POLICE

DEPARTMENT, BLANE VUCCI, GORDON CAREW, JOSEPH MUELLER,

KIMBERLY PARKS, TODD TUGYA, PAUL DEAN, BARRY GRANT, JOSEPH

JEFFERSON, LIEUTENANT HORTON, TOM PFEILER, BRIAN FORD, KEVIN BUIE, JOHN RIDDICK, J. PHELPS, RAY LASLETT, DONALD WATSON, VICTOR HAGEE, and UNKNOWN EMPLOYEES OF THE BALTIMORE CITY POLICE DEPARTMENT, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each Defendant, as well as any other relief this Court deems appropriate.

**JURY DEMAND**

Plaintiff, GARRETH PARKS, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

GARRETH PARKS

By: s/ Tony Balkissoon
One of Mr. Parks's attorneys

C. Justin Brown
Lylian Romero
BROWN LAW
231 E. Baltimore St., Suite 1102
Baltimore, Maryland 21202
Tel: 410-244-5444
Fax: 410-934-3208
brown@cjbrownlaw.com

Jon Loevy
Gayle Horn
Tony Balkissoon
Loevy & Loevy
311 N. Aberdeen St., 3d Fl.
Chicago, IL 60607
Tel: 312-243-5900
Fax: 312-243-5902
tony@loevy.com
*Attorneys for Garreth Parks*